### UNITED STATES DISTRICT COURT
### FOR THE EAST DISTRICT OF VIRGINIA
#### Alexandria Division

_____

|  |  |  |
|---|---|---|
| **MOUSA NAJDI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **BAC HOME LOANS SERVICING, L.P.** | ) | **C.A. No. 1:10-cv-01466-LO** |
| **FKA COUNTRYWIDE HOME LOANS** | ) | |
| **SERVICING L.P., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

_____ )

### PLAINTIFF'S MEMORANDUM IN OPPOSITION
### TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF UNDISPUTED FACTS

Plaintiff, Mousa Najdi, purchased his home at 7313 Dunston Street, Springfield, Virginia 22152, on January 10, 2008.  (Second Amended Complaint ¶ 6.)  The purchase was financed through Countrywide Home Loans, Inc. who took a security interest in the property being purchased. (Exhibit 1 Note; Exhibit 2 Deed of Trust).  Mr. Najdi granted a deed of trust securing a note in the amount of $360,905.00 to Countrywide as Lender, and MERS as the nominee for Lender.  (Exhibit 1).  Sometime following origination, Fannie Mae purchased the loan, and for all relevant times owned the loan.  (Second Amended Complaint ¶¶ 3,9; Exhibit 3 Deposition of Fannie Mae page 90 lines 11-12). BAC, a subsidiary of Bank of America, began servicing the loan.  (Exhibit 4 BA Response to Plaintiff's Request for Admissions ¶ 10).

Mr. Najdi began to experience financial difficulties, and he stopped making his mortgage payments in January 2010. (Exhibit 5 Najdi Deposition page 18 lines 10-15). After speaking with BAC, Najdi submitted papers applying for modification of his loan through the federal Home Affordable Modification Program (HAMP). (Exhibit 6 Najdi Deposition pages 27-31; Exhibit 7 Najdi Affidavit ¶ 19; Exhibit 8 (March 16 Najdi letter and attachments to BAC). Included with his March 16 letter were Najdi's January and February 2010 bank statements, and a copy of his 2009 federal and state tax returns. Id. Najdi met the preliminary requirements for eligibility for modification of his loan through HAMP. (Exhibit 9 Fannie Mae Admissions ¶¶ 38-43).

BAC did not respond to Mr. Najdi's March 16 letter package. In an attempt to save his home and avoid further delinquency, Plaintiff explored the possibility of renting out the basement of his home to another family looking for an affordable place to live. He also contacted a realtor about the possibility of placing his house on the market or conducting a short sale with the bank. (Exhibit 10 Najdi Deposition pages 102-105; Exhibit 7 Najdi Affidavit ¶¶ 16, 17, 21, 33; Exhibit 11 Hawa Affidavit ¶¶ 8-12). Plaintiff further sought out possible assistance from a Chapter 13 bankruptcy attorney as a means of saving his home. (Exhibit 7 Najdi Affidavit ¶ 34; Exhibit 11 Hawa Affidavit ¶ 15,16).

On April 13, 2010, Defendants referred the loan for collection to the law firm of the trustee, Shapiro & Burson. (Exhibit 12 April 13 letter from Shapiro & Burson). Najdi contacted the trustee's office and BAC following receipt of this letter and was assured that nothing would happen regarding foreclosure until BAC authorized such action. (Exhibit 13 Najdi Deposition page 71 lines 12-21; Exhibit 7 Najdi Affidavit ¶ 26).

BAC sent Mr. Najdi a letter dated April 23 asking Najdi to apply for a loan modification. (Exhibit 14 April 23 Letter of BAC).  This letter included a checklist and affidavit.  Id.  Najdi completed the affidavit and submitted this with an IRS form 4506T signed by himself, copies of current utilities bills and a recent bank statement on or about April 29, 2010.  (Exhibit 15 Najdi April 29 submission to BAC).  On May 12, 2010, BAC wrote back to Najdi acknowledging receipt of the application, but stating that the application was incomplete.  (Exhibit 16 BAC May 12 Letter to Najdi).  BAC sought paystubs and an IRS form 4506T signed by both Mr. Najdi and his wife.  Id.  On May 25, Najdi faxed to BAC a new form 4506T signed by himself and his wife, together with a profit/loss statement, as he is self-employed and receives no paystubs. (Exhibit 17 May 25 Faxed documents to BAC).

Following this document exchange, Mr. Najdi next received a letter dated June 4, 2010 from Shapiro & Burson advising him that his home was scheduled for a foreclosure sale on June 25, 2010 at 10:00 a.m. on the Fairfax County Courthouse steps.  (Exhibit 18 June 4 Foreclosure Notice). Najdi contacted BAC and was assured that BAC was working on his request, that nothing would happen until BAC notified him of action taken on his application, and that the foreclosure sale would be postponed.  (Exhibit 19 Najdi Deposition page 81 lines 8-16; Exhibit 7 Najdi Affidavit ¶ 37).  Because he was told to check back in a week, Najdi called BAC again on June 21.  He was told that BAC was still reviewing his application for loan modification, and that the foreclosure would be postponed indefinitely until BAC had taken action following review of his application.  (Exhibit 19 Najdi Deposition page 81-85, Exhibit 7 Najdi Affidavit ¶ 40).

 Mr. Najdi abandoned his efforts to obtain renters for the basement floor of his home. He also ceased efforts to place his house on the market, or to file Chapter 13 Bankruptcy, all in

reliance on representations from Defendants that they were reviewing his loan modification, and that any foreclosure would be postponed until action was taken on his application.  (Exhibit 7 Najdi Affidavit ¶ 38; Exhibit 11 Hawa Affidavit ¶ 17).

Unbeknownst to Mr. Najdi, BAC and/or Fannie Mae had actually concluded that because "borrower qualified for mha [Making Home Affordable] 3/4 [March 4] and no payments made for trial period" the property would be submitted for foreclosure.  (Exhibit 20 Computer Notes regarding transaction activity by BAC and/or Fannie Mae; Exhibit 21 BAC Deposition page 62, lines 6-22).  In doing so, Defendants' notes reflect that no postponements were submitted prior to sale.  (Exhibit 22 Computer Notes regarding transaction activity by BAC and/or Fannie Mae).

Although Defendants' records reflect the Najdi qualified on March 4 for a "trial period" Najdi himself was unaware that he had been deemed qualified, and the terms of a trial plan had not been conveyed to him.  (Exhibit 21 BAC Deposition page 62 lines 15-22;  Exhibit 23 Najdi Deposition page 70, lines 12-20).

Mr. Najdi's home was sold at foreclosure on June 25, 2011.  Fannie Mae purchased the home at foreclosure and began eviction proceedings against Mr. Najdi and his family.  (Second Amended Complaint ¶ 77; Exhibit 24 attached thereto).  Mr. Najdi settled this action as part of an agreement resolving the injunction in the Fairfax Circuit Court.  (Exhibit 25 October 8 Agreed Order).  As part of that same agreement, Najdi has been paying the sum of $1,600 into the Fairfax Court registry for the time period beginning November 2010 to present.  Id.  Mr. Najdi has suffered damage to his credit as a result of Defendants' foreclosure of his home. (Exhibit 26 Rule 26(a) Report of Paula Sherman; Exhibit 27 Najdi Deposition page 100).  In an ironic twist, on August 4, 2010, BAC notified Mr. Najdi that his application for a HAMP loan modification

was complete and that BAC would begin reviewing his request. (Exhibit 28 August 4, Letter from BAC).

## STATEMENT OF DISPUTED FACTS

1.      Plaintiff disputes that he was required to include paystubs in response to the May 12 letter and attachments from BAC.  Mr. Najdi is self-employed; as such, he does not receive paystubs. On May 25, 2010 he submitted a profit and loss statement in response to the May 12 letter from BAC. See Exhibit 16 attached.

2.       Plaintiff disputes the Defendants' contention that the representation on which he bases his claim constitutes a series of letters from BAC that simply describe the HAMP process.  The following representations were made to the Plaintiff in telephone communications with BAC:  1)  Najdi received a letter dated April 13 from Shapiro & Burson.  Mr. Najdi contacted BAC following receipt of this letter and was assured that the trustee would take no action until BAC authorized such action. (Exhibit 13 Najdi Deposition page 71 lines 12-21; Exhibit 7 Najdi Affidavit ¶ 26);  2) Najdi received a letter dated June 4, 2010 from Shapiro & Burson advising him that his home was scheduled for a foreclosure sale on June 25, 2010 at 10:00 a.m. on the Fairfax County Courthouse steps.  Najdi contacted BAC and was assured that BAC was working on his request, that nothing would happen until BAC notified him of action taken on his application, and that the foreclosure sale would be postponed.  (Exhibit 19 Najdi Deposition page 81 lines 8-16; Exhibit 7 Najdi Affidavit ¶ 37). Because he was told to check back in a week, Najdi called BAC again on June 21.  He was told that BAC was still reviewing his application for loan modification, and that the foreclosure would be postponed indefinitely until BAC had taken action following review of his application.  (Exhibit 19 Najdi Deposition page 81-85, Exhibit 7 Najdi Affidavit ¶ 40).

**3.**      Plaintiff disputes that he had no checking account at the time that he applied for loan modification.  Copies of his bank statements were attached to his March 16 and April 29 submissions to BAC. Exhibit C (Exhibit 8 March 16 Najdi letter and attachments to BAC; Exhibit 15 Najdi April 29 submission to BAC).

**4.**      Plaintiff disputes Defendants' contention that he had no funds to cure the past due arrearages.  Mr. Najdi has offered Defendants the sums collected under the injunction bond, which would cure all arrearages that existed at the time of the foreclosure.  (Exhibit 25 Fairfax Circuit Court Agreed Order.)

## <u>STANDARD OF REVIEW</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   The party seeking or opposing summary judgment must support their factual position by citing materials in the record or showing that the materials cited do not demonstrate establish the absence or presence of a genuine dispute.   Fed. R. Civ. P. 56(c).  A factual dispute is material only if it might affect the outcome of the suit under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Whether a genuine issue of material fact is presented will be determined by asking if a reasonable jury could return a verdict for the non-moving party. <u>Id</u>.

## <u>ARGUMENT</u>

**I.  FORECLOSURE WAS IN CONTRAVENTION OF THE DEED OF TRUST AND DISPUTES OF MATERIAL FACTS EXIST SUCH THAT DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW.**

**A.      BREACH OF CONTRACT**

1.  **FORECLOSURE WAS IN CONTRAVENTION OF THE TERMS OF THE DEED OF TRUST**

Every deed of trust to secure debts is in the nature of a contract and shall be construed according to its terms to the extent not in conflict with the requirements of law.  Va. Code § 55-59.  In this case, Mousa Najdi borrowed $360,905.00 from Countrywide Bank, FSB to buy the property known as 7313 Dunston Street, Springfield, VA  22151.  On January 10, 2008, Najdi signed a note promising to pay this this sum to Countrywide in monthly installments of $2,251.58.  Najdi also signed a deed of trust securing the obligation to Samuel White, trustee for the benefit of Mortgage Electronic Registration Systems, as nominee for the Lender and Lender's successors and assigns.

Paragraph 16 of the deed of trust provides that "[t]his Security Instrument shall be governed by federal law and the law of the jurisdiction in which the property is located." (Exhibit 2 Deed of Trust page 8.)  The deed of trust further provides, "All rights and obligations contained in this Security Instrument are subject to <u>any requirements and limitations of Applicable Law.</u>" <u>Id.</u> (emphasis added).  Paragraph J of the Definitions defines Applicable Law: "Applicable Law means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final non- appealable judicial opinions." (Exhibit 2 Deed of Trust page 2).

Defendants acknowledge that the Fannie Mae Servicing Guide controls the relationship between the parties and their actions.  (Defendants' Answer ¶ 140).  This Servicing Guide derives from Treasury Directives under the Home Affordable Modification Program (HAMP), a federal program created by the Emergency Economic Stabilization Act (EESA), 12 U.S.C. § 5201 <u>et seq</u>.  The Guide is promulgated by Fannie Mae in its capacity as financial agent for the

7

United States.  Pennington III v. PNC Mortgage et. al,  2010 U.S. Dist. LEXIS 143157 *9 (E.D.

Va. August 11, 2011).  The procedures and protocols of HAMP are triggered by borrower

default.  These procedures are incorporated into the Security Instrument which Najdi signed, and

to which he is a party, through paragraph 16 of the deed of trust.  Under the remedies section of

the Deed of Trust, paragraph 22 provides that the Lender must provide notice to the borrower

specifying the default "unless Applicable Law provides otherwise."  (Exhibit 2 Deed of Trust

page 9, emphasis added).  This paragraph further provides that the remedy of power of sale is to

be invoked "as permitted by Applicable Law."  Id. (emphasis added).

Contrary to Defendants' contention, participation of servicers of Fannie Mae loans in

HAMP is not optional; it is required.  (Exhibit 30 Fannie Mae Announcement 09-05R April 21,

2009 page 1).  Under these procedures, a borrower under a mortgage loan eligible for Home

Affordable Modification Program who has suffered financial hardship and has fallen behind on

his or her mortgage payments, must be offered an opportunity to participate in the loan

modification.  Id. at 15.  These procedures specifically provide that within 30 days from the date

an initial package is received, the servicer must review the documentation.  (Exhibit 31 Fannie

Mae Announcement SVC-2010-03 February 4, 2010 page 3). If the documentation is

incomplete, the servicer must send the borrower an Incomplete Information Notice in

accordance with the Guide.  Id.  An Incomplete Information Notice must specify the additional

verification documentation and include a specific date when the documentation is to be received,

which must be no less than 30 days from the date of the notice.  Id.  BAC acknowledged receipt

of Najdi's package by letter dated May 12 and specified that Najdi was required to submit a

copy of two of his most recent pay stubs and a signed and dated copy of an enclosed IRS form

4506-T by June 11, 2010.  Najdi provided these additional documents to BAC on or about May

25, 2010.  The Guide required Defendants to do one of the following things:  If the documents are not received by the date specified in the notice, the servicer must send a second notice specifying a date not less than 15 days from the date of the second notice by which the requested documents must be received. (Exhibit 31 Fannie Mae Announcement SVC-2010-03 February 4, 2010 page 3).  If the documentation is complete, however, the servicer must either offer the borrower a trial plan through notice in writing or make a determination that the borrower is not eligible for HAMP and communicate this to the borrower. Id. at 4.  In either event, foreclosure proceedings are to be suspended until the borrower has been evaluated, and if eligible, an offer to participate in HAMP is made.  (Exhibit 30 Fannie Mae Announcement 09-05R April 21, 2009 page 16).

Defendants did neither of these things.  Instead, BAC referred the matter for foreclosure. It was only by letter dated August 4, 2010, that BAC acknowledged receipt of Najdi's documents and review of his application for loan modification. The Guide specifically provides that servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the HAMP program.  Exhibit 30 Fannie MaeAnnouncement 09-05R at 16.  In addition, the Guide provides that "servicers must not conduct foreclosure sales on mortgage loans . . . during the 30 day period that the borrower has to submit documents evidencing an intent to accept a Trial Period Plan offer." Id.  By Defendants' own account, the reason that Najdi's loan was turned over to foreclosure was that he had not complied with a Trial Period Plan.  (Exhibit 21 BAC Deposition page 62).  Najdi was never given notice that he was being considered for a Trial Period Plan, and no Trial Period Plan was ever communicated to him.  (Exhibit 23 Najdi Deposition page 70).

9

The HAMP procedures outlined in the Fannie Mae Servicing Guide which were incorporated into the deed of trust through paragraph 16, were a precondition to foreclosure. The right of the Defendants to foreclose in this case was "subject to the requirements as limitations of Applicable Law."  HAMP procedures, which were in place at the time that Defendants sought their remedy, were a precondition to the right to foreclose.  Simply put, the Defendants were without authority to foreclose prior to evaluating Najdi for loan modification, and conveying their decision on his application to him.

In asserting that there can be no recovery because Defendants were not required to approve the Plaintiff for a loan modification, Defendants' misconstrue Plaintiff's theory of the case.  The basis of Plaintiff's claim is not that Defendants failed to approve him for a loan modification; it is that Defendants failed to follow their own procedures which were required to be followed as part of the contractual obligation between the parties.  Defendants also assert that they did nothing wrong because an after the fact review indicated that Mr. Najdi did not qualify for loan modification.  Affording Mr. Najdi a review only after foreclosure does the Plaintiff little good, and serves to undermine the purpose of the federal guidelines to which the Defendants subscribe.  See Boyd v. Sasco Aamco Mortgage Loan Trust, et. al, 2011 U.S. Dist LEXIS 39609 *9 (N.D. Ill April 12, 2011) (failure to consider borrower for HAMP modification runs afoul of Treasury Department Directives of which HAMP is a part).

Moreover, Plaintiff has not asserted a claim against Defendants based upon a third party beneficiary theory, so those cases cited by Defendants on this point are inapposite.  The absence of a claim of private right of action under HAMP does not preclude a borrower from seeking recovery for Defendants actions or inactions under state law claims.   Blackwood v. Wells Fargo

Bank, N.A., 2011 U.S. Dist. LEXIS 43663 *9 (D. Mass. April 21, 2011); Boyd v. Sasco Aamco

Mortgage Loan Trust et. al, 2011 U.S. Dist. LEXIS 39609 at *9.

Defendants also argue that HAMP procedures cannot be considered a part of the Deed of

Trust as applicable law because HAMP did not exist at the time the Note and Deed of Trust

were signed.  It is the case that laws in Virginia are generally presumed to have prospective

application.  See Resolution Trust  Corp. v. Maplewood Investments, 31 F2d 1276, 1287 (4th Cir

1994) (citing Gloucester Realty Corp. v. Guthrie, 182 Va. 869, 30 S.E.2d 686 (Va. 1944)).  This

rule does not apply, however, to remedial laws.  Duffy v. Hartsook, 187 Va. 406, 417 46 S.E. 2d

570, 576 (1948).  As the Virginia Supreme Court articulated in Duffy, remedial statutes, which

neither create new rights nor take away vested ones, are not within the strict application of the

rule.  187 Va. at 417, 46 S.E.2d at 576 (distinguishing Guthrie where contract specifically

invoked an earlier statute by name, and giving retroactive effect to new statute of limitations

period).

In the present case, as is so amply made clear by Defendants, HAMP does not create or

vest any right of action of a participant to enforce its terms.  Rather, it sets forth the procedure

by which loan modifications are handled, and is remedial in nature.  As the Court in Duffy

further expressed, "legislation affecting matters of remedy may be retroactive in operation if so

expressed and intended. . . ."  187 Va. at 417, 46 S.E.2d at 575 (citing Guthrie 182 Va. at 873,

30 S.E.2d at 688).   HAMP, by its very terms, applies to loans entered into on or before January

1, 2009, such as Mr. Najdi's loan.  It is therefore expressly retroactive in effect.  BAC, who took

on the responsibility of servicing Fannie Mae loans, was well aware of the retroactive effect of

HAMP when it took on the obligation, and cannot be heard to complain now.

11

The Defendants do not dispute that they had received from Mr. Najdi an application for loan modification, or that they requested that he supplement the application with additional documents. (Exhibit 16 BAC May 12 letter).   Similarly, the Defendants do not dispute that the Servicing Guide and related Announcements control the process when a borrower seeks a loan modification.  Defendants received Mr. Najdi's follow up documents by fax on May 25.  Mr. Najdi received no other written notice from the Defendants regarding the status of his application prior to foreclosure of the home on June 25, 2010.

In sum, by the terms of the deed of trust, which incorporates applicable law and thus the HAMP Guidelines, foreclosure in this case was premature.  Defendants failed to meet the necessary preconditions to foreclosure; they had failed to either 1) review and determine Nadji ineligible for loan modification or 2) determine him eligible for a trial plan, provide him with notice of that trial plan and give him an opportunity to comply. These procedural steps were a required precondition to foreclosure under the terms of the deed of trust.

## 2.   DEFENDANTS VIOLATED THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

Defendants breached the Deed of Trust's implied covenant of good faith and fair dealing. An implied covenant of good faith and fair dealing exists in all valid and binding contracts in Virginia.  Acuna v. Chase home Finance, LLC, Federal National Mortgage Association, 2011 U.S. Dist. LEXIS 52971 (E.D. Va. May 16, 2011) (citing Ward's Equip. v. New Holland N. Am, 254 Va. 379, 385, 493 S.E. 2d 516, 520 (1997)).  See also Virginia Vermiculite, Ltd. v. W.R. Grace & Co., 156 F. 3d 535, 541-42 (4th Cir.  1998).  The elements of a claim for breach of an implied covenant of good faith and fair dealing are (1) a contractual relationship between the parties, and (2) a breach of the implied covenant.   Enomoto v. Space Adventures, LTD., 624 F.

Supp. 2d 443, 450 (E.D. Va 2009) (citing <u>Charles E. Brauer Co. v. NationsBank of Virginia,</u> <u>N.A.</u>, 251 Va. 28, 466 S.E.2d 382, 386 (1996.))  "[I]t is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." <u>Virginia Vermiculite, Ltd.</u>, 156 F. 3d at 542 (emphasis in original) .

In the present case, Defendants have breached their duty of good faith and fair dealing by 1) failing to follow the HAMP Guidelines prior to foreclosure; 2) by finding that foreclosure was proper because Najdi had failed a trial plan that was never communicated to him; and 3) by advising Najdi that the foreclosure sale would be postponed when this was not the case.

The purpose of the HAMP Guidelines is to offer homeowners a way to make their mortgages more affordable and to prevent, where possible, the destructive impact of foreclosure. <u>Marques v. Wells Fargo Home Mortgage, Inc. dba America's Servicing Co.</u>, 2010 U.S. Dist. LEXIS 81879 *10-11 (S.D. Cal., August 12, 2010).  The HAMP Guidelines provide that eligible borrowers who have sought modification will, at a minimum, be evaluated for a loan modification before foreclosure occurs. Najdi, and other borrowers like him who seek loan modification, are entitled to an evaluation and written notice of the decision on their application <u>before</u> the loan is foreclosed.  In this regard, The HAMP procedural guidelines set forth steps that the Defendants had to take prior to invoking the remedy of foreclosure.  Defendants' failure to follow these guidelines prior to foreclosure constituted a breach of the implied duty of good faith and fair dealing.

Defendants' stated reason for refusing to postpone the foreclosure was that "borrower qualified for mha [Making Home Affordable] ¾ [March 4] and no payments made for trial

period." (Exhibit 20; Exhibit 21 BAC Deposition page 62). This is an amazing statement, given that no trial plan was ever communicated to the Plaintiff. Indeed, Fannie Mae acknowledged that it is required to review any trial plan, and no trial plan was ever provided for review. In order for Mr. Najdi to have an opportunity to comply with a trial plan, he would have to be first told that he was eligible for Making Home Affordable, and the terms of that trial plan (what the payment amount should be, how long the trial period would extend, what would occur with the arrears) would have to be communicated to him in writing. (Exhibit 31 Fannie Mae Announcement SVC-2010-03 February 4, 2010 at 4) . No such notice was ever provided to the borrower. Instead, in an Alice-in-Wonderland-like twist, Defendants state that they proceeded with foreclosure because Plaintiff was eligible for MHA (a fact not communicated to him) and that he was offered a trial plan (a fact not communicated to him) and that he failed to follow the trial plan, the terms of which were not communicated to him. Defendants decision that it was okay to proceed with foreclosure because Plaintiff had failed a trial plan without ever advising Plaintiff that he was a) actually eligible for Making Home Affordable and b) advising of the terms of the trial plan that he was being offered amounted to a breach of good faith and fair dealing under the deed of trust.

Finally, Defendants breached the implied covenant of good faith and fair dealing by falsely representing to the Plaintiff on June 14 and June 21 that the foreclosure would indeed be postponed. The Defendants' own computer notes, however, indicate that no postponements were submitted prior to sale.

At a minimum, these facts demonstrate that there is enough evidence for a jury to conclude that Defendants did not act in good faith in proceeding with a foreclosure under the circumstances. It was bad faith for Defendants to solicit Plaintiff's application for loan

modification, and then foreclose without first following the prescribed procedures for evaluating

Mr. Najdi's application and notifying him of the outcome of that review.  It was also bad faith to

proceed with a foreclosure based upon Mr. Najdi's failure to follow a trial plan purportedly

offered in March 2010, the terms of which were never actually communicated to him and for

which he never had an opportunity to comply.  Finally, it was bad faith for Defendants to advise

Mr. Najdi on two occasions that the foreclosure sale was being postponed when, in fact,

Defendants had not postponed the sale, as their own computer notes reveal.

## B.    THE EQUITABLE DOCTRINE OF CLEAN HANDS APPLIES

The equitable doctrine of clean hands applies, preventing the Defendants from benefiting

from their wrongful actions.  Foreclosure was created in historic English jurisprudence, and

incorporated into American jurisprudence, as an equitable remedy. See BFP v. Resolution Trust

Corp., 511 U.S. 531, 541 (1994). In subsequent years through the creation of the deed of trust

system in many states, including Virginia, creditors no longer need to go to court in order to

foreclose on home loans.  This development, however, does not make controversies regarding

the right to foreclose any less equitable in nature.  Deeds of trust, as security for payment of a

note, are governed by the law of real property and by equitable principals.  General Electric

Credit Corp. v. Lunsford,  209 Va. 743, 747-48, 167 S.E.2d 414, 418 (1969).  Borrowers may

raise their equitable defenses to foreclosure by affirmatively filing a lawsuit-either an action

seeking to enjoin the foreclosure before it occurs or an action seeking to set aside the foreclosure

after the sale. Virginia's Supreme Court has concluded such affirmative lawsuits are still

equitable in nature.  See Everette v. Woodward, 162 Va. 419, 426, 174 S.E. 864, 867 (1943)

(specifying a challenge to a sale by a trustee to a deed of trust is one "in a court of equity.")

And in reviewing a challenge to the woefully inadequate sale price, the Supreme Court held:

"[s]o jealously does a court of equity guard the rights of the unfortunate," that courts of equity reviewing challenges to sales "will seize upon any inequitable circumstances as a ground to afford relief."   Linney v. Normoyle, 145 Va. 589, 594-95, 134 S.E. 554, 555 (1926).

Under Virginia law, a party who comes into equity must come with clean hands. Richards et. al v. Musselman, 221 Va. 181, 186, 267 S.E.2d 164, 167 (1980).   Contrary to Defendants' assertions, Mr. Najdi has a right to rely on the clean hands doctrine as a traditional equitable defense to the validity of a foreclosure.   While Plaintiff is unaware of a Virginia case on point, the Maryland Court of Appeals confirmed a borrower's ability to raise an equitable defense - specifically an unclean hands defense- in filing a lawsuit to challenge a nonjudicial foreclosure.   See Wells Fargo Home Mortgage, Inc., v. Neal, 922 A.2d 538 (Md. 2007). In that case, the borrower filed an affirmative lawsuit challenging the lender's foreclosure based on its failure to engage in certain loss mitigation practices. Because, as in Virginia, "[t]he foreclosure procedure in Maryland is equitable in nature," Maryland's highest court held that this allegation gave the borrower potential grounds for relief under the "the venerable equity doctrine of clean hands which requires that 'he who comes into equity must come with clean hands.'" Id. at 553. That court specifically rejected the argument that the affirmative nature of a foreclosure defense suit in a nonjudicial state made it impossible for the borrower to raise equitable defenses. Id. at 550.

In the instant case, as in Neal, "[t]he invocation and application of equity principles produces not only a process that is fundamentally fair to the parties and prevents the Court from rewarding inequitable conduct, but also reflects the effectiveness of loss mitigation efforts in avoiding foreclosure." Id. at 553 (citations omitted).

16

In arguing that Mr. Najdi cannot raise either an unclean hands or an equitable estoppel defense to the foreclosure, the Defendants fail to acknowledge the unique nature of nonjudicial foreclosure proceedings.  Because the Defendants may obtain the relief they seek – foreclosure— extra judicially, the burden falls on the homeowners to seek judicial intervention and redress. Mr. Najdi is challenging the foreclosure sale and should be able to "seize upon any inequitable circumstances." Moreover, given the unique nature of defending against nonjudicial foreclosure, Mr. Najdi is indeed using these equitable doctrines as the Defendants demand "as a shield, not a sword."

Under the Unclean Hands Doctrine:

The complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.  Equity will not give relief to one seeking to restrain or enjoin a tortuous act where he has himself been guilty of fraud, illegality, tortuous conduct or the like in respect of the same matter in litigation.

Cline v. Berg, 273 Va. 142, 147 (2007) (quoting Richards v. Mussleman, 221 Va. at 185, 267 S.E.2d at 166).  "Application of the doctrine turns upon the facts of each particular case and is therefore left to the sound discretion of the fact finder."  Id.

A reasonable jury could conclude that the Defendants' failure to follow the HAMP procedures before foreclosing on Mr. Najdi's home left them with unclean hands.  A reasonable jury could also conclude that Defendants' representations to Mr. Najdi that nothing would happen until review of his application was complete, and further, that the foreclosure sale was being postponed, were inequitable and untrue.  Finally, a reasonable jury could conclude that Defendants' decision to foreclose based upon the Plaintiff's failure to comply with a trial plan that was never communicated to him and that he was never given an opportunity to undertake

was inequitable conduct that bars the Defendants from reaping the benefits of the equitable

remedy of foreclosure.

## C.    EQUITABLE ESTOPPEL PREVENTS THE DEFENDANTS FROM BENFITING FROM THEIR MISREPRESENTATIONS

As stated, under Virginia law, foreclosure is an equitable remedy.  General Electric

Credit Corp. v. Lunsford,  209 Va. at 747-48, 167 S.E.2d at 418.  It is therefore subject to

equitable claims and defenses. Id.  Similarly, principals of equitable estoppel prevent a party

from benefiting from a position achieved through the misrepresentation of a contrary position.

A claim for equitable estoppels requires allegations that the party against whom equitable

estoppel is claimed 1) falsely represented or concealed a material fact 2) with knowledge of the

facts 3) the party to whom the representation was made was ignorant of the truth of the matter;

4) the representation was made with the intention that the other party would act upon it and 5)

the party claiming estoppel was misled to his injury.  Acuna v. Chase Home Finance, LLC,

Federal National Mortgage Assoc., 2011 U.S. Dist. LEXIS 52971 13-14 (E.D Va. May 16,

2011).

In the present case, at a minimum, a reasonable jury could conclude that Defendants are

estopped from benefiting from their misrepresentations to this homeowner.  In April, when Mr.

Najdi called, he was assured that the trustee would not act until BAC told him to act.  This

statement, true on its face, contained some significant omissions.   What Najdi was not told was

that he had already been deemed eligible for Making Home Affordable, had apparently been

offered a trial plan and was not in compliance.  Therefore, it was likely that BAC would be

contacting the trustee very soon to authorize foreclosure.  On June 14, and again on June 21,

BAC advised Najdi that the foreclosure sale was being postponed indefinitely because his

application for loan modification was still pending and under review.  Contrary to these

statements, Defendants had not postponed the sale, and Defendants had knowledge of this fact.

At the time Najdi was first advised of this fact, the foreclosure sale had not actually been

postponed, because, according to BAC, a request had not yet been made until June 14.  At the

time of the second representation on June 21, computer notes of the Defendants reveal that

Defendants had knowledge that the loan had not in fact been submitted for postponement of the

sale.  Meanwhile, Defendants also concealed from Mr. Najdi the material fact that he had been

placed in a trial period plan in March.  Najdi himself was without any information regarding the

internal procedures of BAC and Fannie Mae; thus, he was not in a position to know the falsity of

these representations.  The statements were made to Mr. Najdi when he called in concerned

about the status of his loan modification after receiving letters from the trustee's office in April

and again in June.  The circumstances under which the representations were made demonstrate

that they were made with the intent that the borrower would rely on them and assume that the

foreclosure would not in fact occur.

   Najdi had up until this point, been pursuing other options to avoid foreclosure and come

current on the note.  He had been exploring the possibility of renting the basement portion of his

home to another family in order to obtain additional income to come current on the payments.

He had also been exploring the possibility of selling his home to avoid further arrears and

minimize any deficiency.  He had gone so far as to consult with the real estate agent who had

sold him the home about the possibility of placing the house on the market.  This real estate

agent accompanied Najdi to a consult with a Chapter 13 Bankruptcy attorney to see if this was a

way that he could avoid foreclosure and come current on the obligation.  Defendants' statements

to Najdi in April that the trustee would not act to foreclose, and in June that the foreclosure was

19

being postponed caused Najdi to abandon these other avenues.  As a result of Defendants'
misrepresentations, on which Najdi relied, Najdi lost among other things, the opportunity to
minimize his damages.  Defendant, Fannie Mae, purchased the property at foreclosure for
$300,000.  This leaves the Plaintiff with a $60,905 deficiency on the loan.  Had Defendants not
misled the Plaintiff, he could have reduced or eliminated the deficiency altogether, thus
improving his economic situation.  Defendants' misrepresentation therefore cost Mr. Najdi a very
real monetary lost opportunity to minimize his damages.

### D.  DEFENDANTS ENGAGED IN FRAUD IN THEIR DEALINGS WITH THE PLAINFIFF

To establish fraud, a party must establish misrepresentations and reliance on the
misrepresentations.  Winn v. Aleda Const. Co., 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984).
(the elements of fraud are: 1) a false misrepresentation, 2) of a material fact, 3) made
intentionally and knowingly, 4) with intent to mislead, 5) reliance by the party misled, and 6)
resulting damage to the party misled.)  Id. To prove constructive fraud one must show a material
false representation that the hearer believes to be true, that it is meant to be acted on, that it is
acted on, and damage results.  Constructive fraud generally differs from a claim for fraud in that
there is no need to prove intent to deceive.   See Nationwide Insurance Co. V. Patterson, 229 Va.
627, 629, 331 S.E.2d 490, 492 (1985) (third and fourth elements of actual fraud need not be
established.)

The facts presented in this case raise a reasonable inference from which a jury could find
fraud on the part of the Defendants in their dealings with this borrower.  Defendants represented
to Mr. Najdi on June 14 and again on June 21 that the foreclosure sale was postponed because

his loan modification application was pending.  These representations were false.  Defendants had not in fact postponed the sale, and had reason to know that the sale was not being postponed.

Defendants also failed to reveal to Mr. Najdi that he had been determined eligible for Making Home Affordable and had been placed into a trial period plan on March 4.  Defendants had numerous conversations with Mr. Najdi by telephone in March, April and June.  Yet in none of these conversations were these salient facts revealed.  Presumably Defendants would know this fact, because it was the Defendants who determined him eligible and placed him in the trial plan.  At no point did the defendants provide this information to the Plaintiff, in writing, through a required notice, or otherwise.  Yet it was Mr. Najdi's failure to comply with the trial plan which was the stated reason for refusing to postpone the foreclosure sale.   This action amounted to an on-going omission of a material fact.   To compound the misstatements, Defendants behaved as though Mr. Najdi had not completed his application paperwork, sending him a May 12 letter stating that more documentation was necessary.

Collectively these facts could cause a reasonable jury to conclude that Defendants acted with complete indifference, and at worse an actual intent to deceive Mr. Najdi.  Defendants erroneously contend that Plaintiff's fraud claim fails because 1) Defendants did not make misrepresentations of existing fact and 2) Mr. Najdi did not rely on any representations.  In support of their argument, Defendants rely on four distinguishable cases, in two of which the Plaintiffs were *pro se*. In both <u>Willis v. Countrywide Home Loan, LP</u>, 2009 U.S. Dist. 120010 (D. Md. December 23, 2009) and <u>Adams v. U.S. Bank</u>, No. 10-10567, 2010 U.S. Dist. LEXIS 65411, 2010 WL 2670702, at * 10-11 (E.D. Mich. July 1, 2010), <u>pro se</u> Plaintiffs had at most a bare bones recitation of the elements without facts in support of their claims.  <u>See also</u> <u>Campbell v. Indymac Bank, FSB</u>, et.al, 2010 U.S. Dist. LEXIS 7642 (D. Md. January 29, 2010)

(conclusive allegations unsupported by facts).  In Contrast, Mr. Najdi has particularly and

sufficiently alleged these elements with factual content.  In the Massachusetts case of <u>Sankey v.

Aurora Loan Services, LLC.</u>, No. 10-11815, 2010 U.S. Dist. LEXIS 118192, 2010 WL 4450404,

at *2 (D. Mass. Nov. 4, 2010) the case involved an injunction and Plaintiff had to meet the

heightened burden of showing, among other things, a "substantial likelihood of success on the

merits."  This standard is different from a Rule 56 motion where Plaintiff must demonstrate a

genuine issue of material fact, which the Plaintiff has shown here.

   This case is substantially similar to the facts of <u>Jefferson Standard Life Ins. Co. v.

Hedrick,</u> 181 Va. 824, 27 S.E.2d 198 (1943.)  In <u>Jefferson</u>, the plaintiff applied for a construction

loan and informed defendant that the construction was time sensitive and he would not proceed

with construction without the loan.  181 Va. at 829.  The defendant inexplicably stalled the

process all the while informing plaintiff that they were considering the loan.  <u>Id</u>. at 831.

Ultimately, the defendant rejected plaintiff's application months after it had been submitted.  <u>Id</u>.

Although, the plaintiff obtained a loan elsewhere, he suffered the damage he anticipated.  <u>Id</u>. at

832.  Despite the fact that it was plaintiff's choice to delay construction until the defendant

rejected his application, the court held the defendant responsible for the loss since the delay was

a consequence of defendant's false statements.  <u>Id</u>. at 833.

   Similarly, Mr. Najdi, at the behest of Defendants, applied for a loan modification.

Defendants knew of the time sensitive nature of this application, as they were the ones with the

power to foreclose.  Just as in the <u>Jefferson</u> case, Defendants here inexplicably sabotaged the

process, all the while telling Mr. Najdi that a foreclosure would not occur until the HAMP

review had been completed.  Even worse for the present Plaintiff, Mr. Najdi was unable to

pursue foreclosure avoidance options elsewhere, as Defendants foreclosed on the loan.  This lost

opportunity was a consequence of Defendants fraud, and as such, Defendants are responsible for the loss.

Defendants claim that Plaintiff has not relied on Defendants misrepresentations to his detriment.   False statements which induce a person to make predictably damaging decisions are the direct cause of the damage suffered.  <u>Jefferson Standard Life Ins. Co. v. Hedrick</u>, 181 Va. at 835, 27 S.E.2d at 202.  In reliance on Defendants' misrepresentations and omissions enumerated here, Mr. Najdi ceased his efforts to pursue other options to improve his overall financial situation, and these represent very real monetary lost opportunities.  He did not contract with one of the two families that were willing to rent his basement, nor did he further pursue placing his house on the market, or attempting a short sale, or filing for Chapter 13 bankruptcy relief.   A short sale in particular could have allowed Mr. Najdi to sell his underwater home at a price above the foreclosure sale amount *in satisfaction* of the mortgage as opposed to the lesser foreclosure sale price and $60,905 deficiency that Mr. Najdi currently faces.  Moreover, Defendants' wrongful foreclosure of the home has caused damage to Mr. Najdi's credit.  The existence of the fact of the foreclosure has affected his overall credit score and has prevented him from obtaining credit on at least one occasion when he sought credit.  (Najdi Deposition page 100).

## <u>CONCLUSION</u>

In conclusion, there remain genuine issues of material fact in this case, from which a reasonable jury could conclude that the Plaintiff is entitled to recovery.    For the reasons stated herein, Plaintiff prays that this Court dismiss the Defendants' Motion for Summary Judgment, or for such other relief as the Court deems appropriate.

Respectfully submitted,

Mousa Najdi

23

BY COUNSEL

/s/  Susan Stoney                                                    _____
Susan Stoney (VSB #29034)
LEGAL SERVICES OF NORTHERN VIRGINIA
4080 Chain Bridge Road
Fairfax, VA 22030
Telephone:  703-778-4810
Facsimile:  703-218-4486
sstoney@lsnv.org

Attorney for Plaintiff Mousa Najdi

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st Day of August, I electronically filed Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Constantinos G. Panagopoulos (VSB#33356)
BALLARD SPAHR LLP
601 13TH Street, NW, Suite 1000 South
Washington, DC 20005
Telephone: 202.661.2202
Facsimile: 202.661.2299
cgp@ballardspahr.com

/s/ Susan Stoney                                                    _____
Susan Stoney (VSB #29034)
LEGAL SERVICES OF NORTHERN VIRGINIA
4080 Chain Bridge Road
Fairfax, VA 22030
Telephone:  703-778-4810
Facsimile:  703-218-4486
sstoney@lsnv.org

Attorney for Plaintiff Mousa Najdi